## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**UNITED STATES OF AMERICA**

**v.**

**MARGO DEAL ANDERSON**
  **and**
**JOSEPH ADAM ALBRITTON**

_____/

**SEALED
INDICTMENT**

5:20cr28-MW

**THE GRAND JURY CHARGES:**

## COUNT ONE

## A. INTRODUCTION

At all times material to this Indictment:

1.   **MARGO DEAL ANDERSON** was elected as Mayor of Lynn Haven

on April 21, 2015.  **ANDERSON** was re-elected as Mayor of Lynn Haven on April

16, 2019.  As Mayor of Lynn Haven, **ANDERSON** was the head of the municipal

government and supervised the City Manager, who was responsible for the day-to-

day operations and administrative functions of Lynn Haven.  **ANDERSON,** as

Mayor, participated in all Lynn Haven Commission meetings, set the agenda for all

Commission meetings, and possessed one vote on the City Commission equal to

each Commissioner.

FILED USDC FLND TL
AUG 18 '20 PM12:56

2.      Between on or about August 22, 2017, and March 26, 2019, Michael

Edward White (M. White) was the City Manager of Lynn Haven.  As City

Manager, M. WHITE was the administrative head of the municipal government

and was responsible for the day-to-day operations and administrative functions of

Lynn Haven.

3.      **JOSEPH ADAM ALBRITTON** entered into a contract with Lynn

Haven to be the City Attorney for Lynn Haven on or about October 22, 2018,

effective October 15, 2018, for one year.  The contract retained **ALBRITTON** to

provide professional legal services and perform other related duties to the

Governing Body of the City and its employees as specified in the agreement.

**ALBRITTON** executed an addendum to the professional services contract to be

City Attorney on or about October 31, 2019, for an additional period of two years.

4.      As the mayor of Lynn Haven, **MARGO DEAL ANDERSON** was an

agent of the City of Lynn Haven, and had a fiduciary duty to act in the best

interests of Lynn Haven and its citizens.

5.      As the City Attorney for Lynn Haven, **JOSEPH ADAM**

**ALBRITTON** was an agent of the City of Lynn Haven, and had a fiduciary duty

to act in the best interests of Lynn Haven and its citizens.

6.      Erosion Control Specialists ("ECS) was incorporated in the State of

Florida on May 10, 2011.  David Mitchelle White ("D. White") was listed as a

2

director of ECS.  In a 2018 amended annual report and a 2019 annual report filed

with the State of Florida, D. White was listed as a director and Vice President of

ECS.

7.     On October 10, 2018, Hurricane Michael caused severe damage to

public and private property, public utilities, public buildings, public

communications systems, public streets and roads, and public drainage systems

within the City of Lynn Haven, Florida (Lynn Haven).

8.     On October 16, 2018, as a result of Hurricane Michael, Lynn Haven

adopted a local state of emergency for post disaster relief and planning and

approved Hurricane Michael Resolution No. 2018-10-16.  In the resolution, Lynn

Haven waived the procedures and formalities otherwise required under Florida law

to take action to ensure the safety, welfare, and health of the citizens of Lynn

Haven, including: entering into contracts; incurring obligations; acquisition and

distribution of materials, supplies, and other expenses related to the storm event;

appropriation and expenditure of public funds; and the employment of permanent

and temporary workers.  The resolution delegated emergency powers to the mayor

of Lynn Haven, **MARGO DEAL ANDERSON,** or her designee, to discharge the

duties and exercise powers for the above described activities until the local

emergency declared had expired and the resolution was rescinded.  The

3

Declaration of Emergency was to be automatically renewed every seven days until further action was taken by Lynn Haven.

9.   On October 23, 2018, as a result of Hurricane Michael, Lynn Haven again declared and reinstated a local state of emergency for post disaster relief and planning and entered Hurricane Michael Resolution No. 2018-10-23-002.  This Declaration of Emergency contained the same provisions as the original declaration of emergency and was effective for seven days.  The Declaration of Emergency was required to be renewed or it would automatically expire.

10.   On October 30, 2018, Lynn Haven voted to end the local state of emergency and end the designation of the emergency powers to the mayor or her designee.

11.   Prior to Hurricane Michael, Lynn Haven contracted with two national disaster relief companies to provide disaster relief services for the city following a hurricane.  These companies, referred to as Company C and Company D in this Indictment, provided debris removal services for Lynn Haven after Hurricane Michael, submitted invoices with supporting documentation for their services, and received payment from Lynn Haven, which was reimbursed by the Federal Emergency Management Agency (FEMA) for the expenses.

12.     FEMA is an agency of the United States Department of Homeland Security and is responsible for coordinating the federal government's response to natural and man-made disasters.  The primary purpose of FEMA is to coordinate the response to a disaster that has occurred in the United States and that overwhelms the resources of local and state authorities.  In addition to on-the-ground support of disaster recovery efforts, FEMA provides state and local governments with experts in specialized fields and the funding for rebuilding efforts for infrastructure.  FEMA also provides for the reimbursement of many expenses incurred by local governments in cleaning up and restoration after natural disasters, such as hurricanes.

13.     On October 22, 2018, with the knowledge and concurrence of **MARGO DEAL ANDERSON**, M. White, on behalf of Lynn Haven, and D. White, as owner of ECS, signed an agreement for ECS to provide Lynn Haven with "Emergency And/Or Exigent Services, Ancillary Construction Services, or Construction Due To The Effects of Hurricane Michael."  The agreement referenced ECS as a "contractor," with the effective date of October 11, 2018.  The term of the agreement was for no more than 90 days to perform services for Lynn Haven.  As part of the agreement, ECS agreed to provide detailed invoices requesting payment for services accompanied by such documentation or data, including back-up documentation sufficient for reimbursement of expenses by

5

FEMA for Lynn Haven payments to ECS.  **JOSEPH ADAM ALBRITTON**
drafted this agreement.

14.    On or about October 28, 2018, with the knowledge and concurrence
of **MARGO DEAL ANDERSON**, M. White, on behalf of Lynn Haven, and D.
White, owner of ECS, signed an amended agreement for ECS to provide Lynn
Haven with "Emergency And/Or Exigent Services, Ancillary Construction
Services, or Construction Due To The Effects of Hurricane Michael."  Notably, the
90 day term provided for in the original agreement was replaced with no deadline;
rather, the agreement provided the duration to be "for such time as necessary to
perform the services for the project."  Additionally, the amended agreement
included new specific language advising D. White and ECS that FEMA financial
assistance would be used to fund the contract with Lynn Haven, and that ECS
would comply with all applicable federal regulations and executive orders, as well
as all FEMA policies, procedures, and directives.  Under the amended agreement,
ECS also agreed to provide FEMA with access to its books and records, and was
further advised of federal program fraud and false statement prohibitions.
**JOSEPH ADAM ALBRITTON** drafted this amended agreement.

15.    After Hurricane Michael, **MARGO DEAL ANDERSON** requested
that the City Manager and D. White have ECS provide debris removal and repairs
to her personal residence and the private residences of her mother and another

neighbor.  These services were billed by ECS to, and paid by, Lynn Haven in invoices that falsely claimed services were provided for public areas in Lynn Haven.

16.     In late October or early November 2018, **JOSEPH ADAM ALBRITTON** discussed with D. White expanding the work that ECS was performing for Lynn Haven, to include the pick-up of residential trash in Lynn Haven.  **ALBRITTON** drafted a supplemental agreement between Lynn Haven and ECS authorizing ECS to assist Lynn Haven in the removal of residential trash. The effective date of this "task order" was listed as three weeks earlier – October 15, 2018, and the "task order" authorized payment to ECS at a rate of no more than $300.00 per hour, per crew, for removal of trash.  The task order stated that it would terminate upon notice by Lynn Haven, but was not to exceed 45 days from the effective date (October 15, 2018).

17.     On November 8, 2018, M. White and D. White executed an "Exhibit A – Task order 18-001" that ostensibly was an agreement under the Amended Agreement described in paragraph #12 above, authorizing ECS to charge Lynn Haven for residential trash pick-up, including allowing ECS to bill Lynn Haven for residential trash pick-up that had not been performed by ECS during October 2018.

18.     In late October 2018, **JOSEPH ADAM ALBRITTON** provided to City Manager M. White a list of companies that he claimed had provided prices that would be charged to receive reduced vegetative debris or chips. **ALBRITTON** advised M. White that a company, referred to as Company A in this Indictment, provided the lowest price at $4.70 per cubic yard and there was an immediate need to dispose of reduced debris.  **ALBRITTON** told M. White that Lynn Haven had asked that the debris removal companies associated with the City use only locations that charged at a rate that the haulers could bill to Lynn Haven that was higher than several of the individuals and companies who attempted to submit bids for the debris dumping.  **ALBRITTON** also told the City Manager that the dumping location owned by Company A was the most economic solution and should be selected by debris removal companies associated with Lynn Haven to dispose of vegetative debris or chips.  At that time, **ALBRITTON** was also employed by, and provided legal services to, Company A, a fact that was not disclosed by **ALBRITTON**.

19.     After Hurricane Michael, **JOSEPH ADAM ALBRITTON** directed D. White to have ECS provide debris removal and repairs to his personal residence and the residence of his girlfriend.  These services were billed to Lynn Haven by ECS in invoices that falsely claimed services were provided for public areas in Lynn Haven, which paid ECS.  **ALBRITTON** also requested and obtained from

ECS an invoice for the debris removal services provided at his residence, which

invoice **ALBRITTON** submitted to his insurance company falsely claiming he had

paid ECS for debris removal and repairs.

### B.  THE CHARGE

Between on or about August 1, 2015, and on or about August 11, 2020, in

the Northern District of Florida and elsewhere, the defendants,

**MARGO DEAL ANDERSON**
**and**
**JOSEPH ADAM ALBRITTON,**

did knowingly and willfully combine, conspire, confederate, and agree together

and with other persons to:

1.  devise, and intend to devise, a scheme to defraud and for obtaining

    money and property by means of material false and fraudulent pretenses,

    representations, and promises, and to cause wire communications to be

    transmitted in interstate and foreign commerce for the purpose of

    executing such scheme, in violation of Title 18, United States Code,

    Section 1343; and

2.  did knowingly and willfully devise and intend to devise a scheme to

    defraud and deprive the City of Lynn Haven and its citizens of their right

    to the honest services of **ANDERSON**, the elected Mayor of Lynn

    Haven, Florida, and **ALBRITTON,** the City Attorney for Lynn Haven,

9

Florida, through bribery or kickbacks, and to cause wire communications to be transmitted in interstate and foreign commerce for the purpose of executing such scheme, in violation of Title 18, United States Code, Sections 1343 and 1346;

### C.  MANNER AND MEANS

The manner and means by which this conspiracy was committed included the following:

### Public Official Positions

1.      The defendants and conspirators used **MARGO DEAL ANDERSON's** public official position as the Mayor of Lynn Haven, and **JOSEPH ADAM ALBRITTON's** public official position as a City Attorney of Lynn Haven, to offer, give, solicit, receive, agree to accept, and accept things of value from companies and individuals having business interests in Lynn Haven. These things of values were offered to **ANDERSON** and **ALBRITTON** with the intent that they would be influenced in the performance of official acts. **ANDERSON** and **ALBRITTON** demanded, sought, agreed to accept, and received things of value with the intent that they would be influenced in the performance of official acts.

10

2.     **MARGO DEAL ANDERSON** used her position as Mayor of Lynn Haven to take official action favorable to Company A, Company B, and other companies, that included voting on measures pending before the Lynn Haven City Commission, signing resolutions, contracts, agreements, and promissory notes, and pressuring and advising City officials to perform specific official acts.

3.     **JOSEPH ADAM ALBRITTON** used his position as City Attorney of Lynn Haven to take official action favorable to Company A, Company B, and other companies, including drafting official documents, signing official documents, conducting alleged bid procedures for contracts, and pressuring and advising City officials to perform specific official acts.

### ECS Fraudulent Invoices

4.     D. White used ECS as a means to fraudulently obtain money from Lynn Haven.  D. White submitted invoices requesting payment for services allegedly provided by ECS to Lynn Haven, but which were false and fraudulent as to a number of material matters.

5.     M. White, as City Manager of Lynn Haven, approved all ECS invoices and directed city employees to immediately pay ECS for those invoices, even though other contracted debris removal companies had to wait for payment of invoices submitted for Hurricane Michael disaster relief and debris removal.

11

6.     After Hurricane Michael, **MARGO DEAL ANDERSON** requested that the City Manager and D. White have ECS provide debris removal and repairs to her personal residence and the private residences of her mother and a neighbor. These services were valued at approximately $48,000 but were billed by ECS to, and paid by, Lynn Haven in invoices that falsely claimed services were provided for public areas in Lynn Haven.

7.     **MARGO DEAL ANDERSON** and M. White signed Lynn Haven checks issued to ECS based upon fraudulent invoices that falsely claimed work by ECS was performed at various Lynn Haven public locations when the invoices included work performed by ECS at private residences and premises of public officials, including **ANDERSON** and the private residences of her mother and a neighbor.

8.     While D. White and ECS were providing services to Lynn Haven, M. White received things of value from D. White, including repairs to, and debris removal from, M. White's residence in Lynn Haven and his farm located outside Lynn Haven in Bay County, money for the purchase of M. White's farm, an automobile, and cash.

9.     These repairs to, and debris removal from, the residence and farm of M. White were billed to Lynn Haven with false invoices submitted by D. White to Lynn Haven with invoices falsely stating that work had been performed at

locations in Lynn Haven. M. White approved the ECS invoices and directed Lynn

Haven employees to pay the invoices.

    10.    While D. White and ECS were providing services to Lynn Haven,

**MARGO DEAL ANDERSON** received things of value from D. White, including

repairs to, and debris removal from, **ANDERSON's** private residence in Lynn

Haven and the private residences of her mother and a neighbor.

    11.    After Hurricane Michael, **JOSEPH ADAM ALBRITTON** caused

D. White to have ECS provide debris removal and repairs to his personal residence

and the residence of his girlfriend. These services were valued at approximately

$25,000, but were billed by ECS to, and paid by Lynn Haven in invoices that

falsely claimed services were provided for public areas in Lynn Haven,

**ALBRITTON** also requested and obtained from ECS an invoice for the services

provided at his residence, which invoice falsely stated that **ALBRITTON** paid the

invoice in full, and which **ALBRITTON** submitted to his insurance company

falsely claiming that he paid ECS for debris removal and repairs, and requesting

reimbursement from the insurance company.

    12.    While D. White and ECS were providing services to Lynn Haven,

**JOSEPH ADAM ALBRITTON** received things of value from D. White,

including repairs to, and debris removal from, the private residences of

**ALBRITTON** and his girlfriend in Lynn Haven, and cash.

13.     When ECS invoices were being assembled for submission to FEMA by Lynn Haven for reimbursement, it was apparent that most of the ECS invoices that had been paid provided no details in support of the requested payments. When directed to provide supporting documentation for the monies requested and already paid, D. White submitted false time sheets prepared by another person. The time sheets were false and fraudulent in that they included names of individuals who had not worked at the claimed location, were off that day, worked at other projects outside Lynn Haven, or had never worked for ECS at the time of the timesheet. Additionally, in many invoices, the specific Lynn Haven locations of work claimed to have been done by ECS were false. These time sheets describing the attendance of ECS workers were certified by a Lynn Haven Department Head of Recreation and Parks, as accurate, but they were not, as the public official well knew.

14.     ECS invoices were submitted to Lynn Haven for payment of services that were not authorized under the emergency contract and were for the private residences of some Lynn Haven officials. The performance of ECS post-hurricane debris removal and repairs at the private residences of some Lynn Haven officials and other private individuals were concealed and not disclosed in the ECS invoices submitted by D. White. M. White approved the invoices and caused them to be paid to ECS by Lynn Haven.

15.     A check register listing all checks and payments of monies to vendors by Lynn Haven was provided to **MARGO DEAL ANDERSON**, City Manager M. White, and the Deputy Finance Director on a regular basis.  The check register included the amount of the Lynn Haven check, the vendor, and related accounting information.  **ANDERSON** regularly signed off on the check register detailing Lynn Haven payments to vendors, including ECS.  **ANDERSON** signed off on a number of check registers that included the payment of invoices to ECS totaling approximately $5 million between October 26, 2018, and March 2019, and never questioned any of the payments made to ECS until after the resignation of the City manager and the subsequent inquiry concerning the large amount of monies paid by Lynn Haven to ECS.

16.     On October 23, 2018, D. White and ECS submitted to Lynn Haven a false invoice for hurricane clean-up in the amount of $180,722.75 that claimed work by ECS was done at a Lynn Haven park and water plant on eight separate days.  The ECS supporting documents submitted to Lynn Haven for this fraudulent invoice included individuals who were in fact working at locations outside Lynn Haven for a different contractor.  This invoice, and a separate ECS $44,000 invoice for painting a Lynn Haven building prior to the hurricane, were approved and paid by Lynn Haven as emergency expenditures.  With the approval of **MARGO DEAL ANDERSON,** M. White issued a handwritten check in the amount of

15

$224,722.75 to ECS within three days after the submission of the invoices, and **ANDERSON** specifically authorized the cashing of the Lynn Haven check.

17.     On November 12, 2018, a false invoice for hurricane clean-up in the amount of $527,512.65 was submitted to Lynn Haven by D. White and ECS that falsely claimed work by ECS was done at a cemetery and sports complexes during a seven day period. Instead of doing the work at the locations described, ECS workers conducted debris removal and clean-up at the residence of M. White located in Lynn Haven, his farm located outside of Lynn Haven in Bay County, the residences of **MARGO DEAL ANDERSON,** her mother, and a neighbor, and the residences of **JOSEPH ADAM ALBRITTON** and his girlfriend. The work on these private residences was concealed and not reported in the invoices, and no supporting documents to the invoice were provided. The invoice was approved by M. White, who directed employees of Lynn Haven to pay this invoice. This invoice was included in the payment of three invoices to ECS in a Lynn Haven check issued to ECS on November 15, 2018, totaling $1,288,716.54.

18.     For the invoice submitted on November 12, 2018, described in paragraph #17 above, D. White and ECS subsequently submitted false Daily Time Sheets purporting to show numerous individuals worked 12 hours per day on November 11, 2018. These time sheets were prepared by a conspirator, who also prepared time sheets for the same day for ECS to pay its employees. The payroll

16

time sheets prepared by the conspirator and used to pay ECS employees listed most of the employees as not working on that day.

### ECS Trash Pick-Ups

19.     After the initial declaration of an emergency by Lynn Haven had been revoked and expired, **JOSEPH ADAM ALBRITTON, MARGO DEAL ANDERSON,** and others sought to locate additional Lynn Haven projects that could provide money to D. White and ECS.  One project was the Task Order agreement that **ALBRITTON** drafted and directed the City Manager to execute with D. White, ostensibly as part of the Emergency Agreement with ECS, to conduct trash pick-up using a pick-up truck and a trailer, at a cost of no more than $300 per hour per crew, throughout Lynn Haven.  This action was implemented despite the ability of Lynn Haven waste trucks to pick-up large amounts of household trash and deposit large amounts of trash at the dump at no increased cost to Lynn Haven.

20.     In late October or early November 2018, **JOSEPH ADAM ALBRITTON** discussed with D. White expanding the work that ECS was performing for Lynn Haven, to include the pick-up of residential trash in Lynn Haven.  **ALBRITTON** drafted a supplemental agreement between Lynn Haven and ECS authorizing ECS to assist Lynn Haven in the removal of residential trash. The effective date of this "task order" was listed as three weeks earlier – October

15, 2018, and the "task order" authorized payment to ECS at a rate of no more than

$300.00 per hour per crew for removal of trash.  The task order stated that it would

terminate upon notice by Lynn Haven, but was not to exceed 45 days from the

effective date (October 15, 2018).

21.     On November 8, 2018, M. White and D. White executed an "Exhibit

A – Task order 18-001" that ostensibly was an agreement under the Amended

Agreement described in paragraph #14 of Section A above, authorizing ECS to

charge Lynn Haven for residential trash pick-up, including allowing ECS to bill

Lynn Haven for residential trash pick-up that had not been performed by ECS

during October 2018.

22.     On November 9, 2018, **JOSEPH ADAM ALBRITTON** sent an email

to City Manager M. White and **MARGO DEAL ANDERSON** that the trash pick-

up work order did not require approval by the Commission, as it confirmed the verbal

task order approved by **ANDERSON** and M. White in October.  The trash pick-up

Task Order was then removed from the agenda for approval by the Lynn Haven

Commission.

23.     On November 13, 2018, a false invoice for hurricane clean-up in the

amount of $332,387.76 was submitted to Lynn Haven by D. White and ECS that

falsely claimed trash pick-up was conducted by ECS during a fourteen day period

starting on October 18, 2018.  No documentation was submitted in support of this

18

invoice.  The claimed trash pick-up did not occur, and there was no record of any

trash being dumped at the Bay County refuse location, nor did City manager M.

White obtain approval from Bay County for ECS to use the account of Lynn

Haven to dump items at the Bay County facility until at least October 31, 2018.

This invoice was included in the payment of three invoices to ECS in a Lynn

Haven check issued to ECS on November 15, 2018, totaling $1,288,716.54.

24.     From the monies fraudulently paid by Lynn Haven for trash pick-up

that did not actually occur, **JOSEPH ADAM ALBRITTON** solicited D. White to

pay **ALBRITTON** money paid to ECS pursuant to the trash pickup agreement.

Over the course of the next twelve weeks, **ALBRITTON** received $10,000 in cash

from D. White per week of claimed trash pickup, linking to the payment of twelve

weeks of trash pick-up in Lynn Haven.

25.     On November 29, 2018, a false invoice for hurricane clean-up in the

amount of $135,445.03 was submitted to Lynn Haven by D. White and ECS that

falsely claimed trash pick-up was conducted by ECS during a seven day period

starting on November 23, 2018, (the day after Thanksgiving).  However, there

were only 6 dump tickets from the Bay County refuse location for this time period,

for which D. White and ECS charged Lynn Haven $19,349 per day.  This invoice

was included in the payment of two invoices to ECS in a Lynn Haven check issued

to ECS on November 30, 2018, totaling $433,365.85.  At the direction of

**ALBRITTON,** D. White paid **ALBRITTON** $10,000 in cash from the proceeds of the Lynn Haven check to ECS.

26.   On December 13, 2018, a false invoice for hurricane clean-up in the amount of $185,503.17 was submitted to Lynn Haven by D. White and ECS that falsely claimed trash pick-up was conducted by ECS during a 13-day period starting on November 30, 2018.  The actual dump tickets from the Bay County refuse location for this time period did not support the claims of the invoice. Additionally, the trash-pick-up agreement had expired on November 29, 2018, and ECS was not authorized to collect residential trash or receive payment from Lynn Haven for such services.  This invoice was included in the payment of two invoices to ECS in a Lynn Haven check issued to ECS on December 14, 2018, totaling $515,731.31.  At the direction of **ALBRITTON,** D. White paid **ALBRITTON** $20,000 in cash from the proceeds of the Lynn Haven check to ECS.

27.   On December 28, 2018, a false invoice for hurricane clean-up in the amount of $481,215.24 was submitted to Lynn Haven by D. White and ECS that falsely claimed trash pick-up was conducted by ECS during a 17-day period starting on December 13, 2018, and continuing before and after Christmas Day, and through Christmas week.  The majority of ECS workers did not work for the two weeks before and after Christmas.  The invoice falsely claimed trash pick-up

20

totaling between $21,000 and $32,000 per day during this period.  Additionally,

the trash-pick-up agreement had expired on November 29, 2020, and ECS was not

authorized to collect residential trash or receive payment from Lynn Haven for

such services.  This invoice was included in the payment of two invoices to ECS in

a Lynn Haven check issued to ECS on December 31, 2018, totaling $725,941.09.

At the direction of **ALBRITTON,** D. White paid **ALBRITTON** $20,000 in cash

from the proceeds of the Lynn Haven check to ECS.

28.     On January 13, 2019, three months after Hurricane Michael, a false

invoice for hurricane clean-up in the amount of $479,020.68 was submitted to

Lynn Haven by D. White and ECS that falsely claimed trash pick-up was

conducted by ECS during a 13-day period starting the day after New Year's Day.

The invoice also falsely claimed that between 11and 13 crews were used to collect

trash daily.  The invoice falsely claimed trash pick-up during this period totaling

$32,278.68 per day for five days, $38,878.44 per day for seven days, and

$45,478.20 for the last day.  Additionally, the trash-pick-up agreement had expired

on November 29, 2018, and ECS was not authorized to collect residential trash or

receive payment from Lynn Haven for such services.  This invoice was included in

the payment of two invoices to ECS in a Lynn Haven check issued to ECS on

January 15, 2019, totaling $895,441.52.  At the direction of **ALBRITTON,** D.

21

White paid **ALBRITTON** $20,000 in cash from the proceeds of the Lynn Haven check to ECS.

29.     On January 25, 2019, three months after Hurricane Michael, a false invoice for hurricane clean-up in the amount of $216,771.24 was submitted to Lynn Haven by D. White and ECS that falsely claimed trash pick-up was Conducted by ECS during a six day period.  The invoice also falsely claimed that crews were used to collect trash daily.  The invoice falsely claimed trash pick-up during this period totaling $38,878.44 per day for four days, $35,578.56 for one day, and $25,678.92 for the last day.  Additionally, the trash-pick-up agreement had expired on November 29, 2018, and ECS was not authorized to collect residential trash or receive payment from Lynn Haven for such services.  This invoice was included in the payment of two invoices to ECS in a Lynn Haven check issued to ECS on January 31, 2019, totaling $433,259.16.  At the direction of **ALBRITTON,** D. White paid **ALBRITTON** $10,000 from the proceeds of the Lynn Haven check to ECS.

### Disposal of Vegetative Debris or Chips

30.     On October 30, 2018, **JOSEPH ADAM ALBRITTON** provided to City Manager M. White a list of companies that he falsely claimed had provided prices that would be charged to receive reduced vegetative debris or chips, and advised M. White that Company A provided the lowest price at $4.70 per cubic

yard and there was an immediate need to dispose of reduced debris. **ALBRITTON** further told M. White that Lynn Haven had asked that the debris removal companies associated with the City use only locations that charged a price of $4.70 per cubic yard or less.

31.    At the time that **JOSEPH ADAM ALBRITTON** advised the City Manager that the dumping location owned by Company A was the most economic solution and should be selected by debris removal companies associated with Lynn Haven to dispose of vegetative debris or chips, **ALBRITTON** was employed by, and provided legal services to, Company A, and **ALBRITTON** was the registered agent for 14 companies of the owner of Company A.  Additionally, ALBRITTON was a co-owner with the owner of Company A in another company and had been since February of 2017.  None of these ties, financial interests, and relationships with Company A and its owner were disclosed by **ALBRITTON** to Lynn Haven.

32.    One of the companies that **JOSEPH ADAM ALBRITTON** falsely claimed had not provided a price for the vegetative debris or chips disposal had actually advised officials in Lynn Haven, including **ALBRITTON**, in writing that it would accept the vegetative debris or chips for $4.00 per cubic yard, or even lower at $3.50 per cubic yard, and save the taxpayers money both as to the price and the costs of transportation since its disposal sites were closer to Lynn Haven than Company A or the other possible disposal sites.

23

33.     After the selection of Company A became public and an objection to

the selection by Lynn Haven of Company A to be used by debris removal

companies associated with Lynn Haven to dispose of vegetative debris or chips

was made to Lynn Haven officials, one of Company A's owners asked **JOSEPH**

**ADAM ALBRITTON** to forward **ALBRITTON's** summary of the obtaining of

prices to a representative of Company D, a large debris removal company

contracted with Lynn Haven to conduct post-Hurricane Michael debris removal, so

Company D could incorporate and justify the use of the Company A site for

vegetative debris or chips disposal.

34.     In or about late October, **MARGO DEAL ANDERSON** convened a

meeting with one of the owners of Company A, the owner of Company B, City

Manager M. White, and several other persons at the personal residence of the

owner of Company B.  At the meeting, **ANDERSON** praised the president of

Company B and his previous post-hurricane assistance to Lynn Haven, and the

owner of Company B complained about not receiving enough of Lynn Haven post-

Hurricane Michael business.

35.     On November 1, 2018, at the direction of **MARGO DEAL**

**ANDERSON,** City Manager M. White issued a directive to Company C, a debris

removal company that was contracted with Lynn Haven to conduct post-Hurricane

Michael debris removal and clean-up, to utilize a site owned by Company B to

dispose of all vegetative debris or chips.  Company C, which had been disposing of

vegetative debris or chips at another site location, stopped dumping at that site

location and commenced disposing of all of its vegetative debris or chips at the site

of Company B. Fees totaling more than $1 million for the disposal of items by

Company C at Company B's site for the next one-year period were paid by Lynn

Haven.

36.     On or about November 11, 2018, at the direction of **MARGO**

**DEAL ANDERSON,** City Manager M. White issued a directive to Company D, a

debris removal company that was contracted with Lynn Haven to conduct post-

Hurricane Michael debris removal and clean-up, to utilize a site owned by

Company B to dispose of all vegetative debris or chips.  Company D, which had

been disposing of vegetative debris or chips at another site location, ended

dumping at that site location and commenced disposing of all of its vegetative

debris or chips at the site of Company B.  Fees totaling more than $1 million for

the disposal of items by Company D at Company B's site for the next year period

were paid by Lynn Haven.

37.     On November 19, 2018, at the request of the co-owner of Company

A, **JOSEPH ADAM ALBRITTON** sent to the vice-president of Company D,

contracted to remove debris in Lynn Haven after Hurricane Michael, an email with

the subject, "Justification Notice," and provided his summary and analysis that the

Company A site be used to dispose of vegetative debris or chips by all debris removal companies associated with Lynn Haven.

### Disaster Debris Management Site

38.     While Lynn Haven was finalizing its decision concerning the location to be utilized for the disposal of vegetative debris or chips, City Manager M. White consulted with the City Engineer and planned to have real property owned, but not used by Lynn Haven, permitted by the State of Florida to be used by debris removal companies associated with Lynn Haven to dispose of vegetative debris or chips.

39.     However, **MARGO DEAL ANDERSON** instructed City Manager M. White to stop the permitting process for the Lynn Haven property for the disposal of vegetative debris or chips and stated that it would be unnecessary.

40.     **MARGO DEAL ANDERSON** then directed City Manager M. White to seek authorization from the State of Florida for Lynn Haven to obtain a new Disaster Debris Management Site (DDMS) at property owned by Company B in Bay County.  Accordingly, on November 7, 2018, City Manager M. White filed a written request with the State of Florida requesting authorization for Lynn Haven to use a new DDMS for temporary storage and processing of disaster debris generated as the result of Hurricane Michael.

41.    During the same period of time that the DDMS authorization was arranged for Company B, two disaster debris companies, contracted with Lynn Haven for debris removal, were directed to dispose of the vegetative debris or chips at Company B's site, and Company B received payment of fees for that dumping from Lynn Haven, **MARGO DEAL ANDERSON** accepted things of value from the owner of Company B, including travel in a private airplane for **ANDERSON** and another person to Biloxi, Mississippi, and the Florida Keys, lodging, meals and entertainment, and lodging aboard a private yacht and meals in Key West, Florida.

### 17th Street Projects and ½ Cent Surtax Design/Build Contract

42.    In August 2015, Lynn Haven approved an agreement for Company B to perform work in the amount of $3.72 million for the 17th Street Ditch Stormwater Project (17th Street project).  Lynn Haven also approved the financing of the project by Company B at an interest rate of 2.55 per cent for a term of 20 years.

43.    On March 20, 2017, **MARGO DEAL ANDERSON** signed, on behalf of Lynn Haven, a promissory note to pay Company B $3.72 million with respect to the 17th Street project.  The promissory note was for a period of 30 years – 10 years greater than what was approved by the Lynn Haven City Commission - and required Lynn Haven to pay interest of 2.55 per cent annually and make monthly

27

payments to Company B.  In financing the 17th Street project with Company B,

Lynn Haven agreed to pay Company B approximately $1.6 million, as interest, in

addition to the $3.72 million the City would pay Company B for its work on the

17th Street project contract.

44.    On July 29, 2017, **MARGO DEAL ANDERSON** and the Lynn

Haven Commission approved a resolution authorizing the issuance by Lynn Haven

of a $3,910,000 municipal revenue bond and a loan agreement to be signed with a

financial institution to provide the funding for Lynn Haven to pay for infrastructure

work in the City that was to be conducted by Company B.  The term of the loan

was for 10 years and the interest rate was 2.18 per cent per annum.  **ANDERSON**

signed the resolution and bond loan agreement.

45.    On August 9, 2017, **MARGO DEAL ANDERSON** signed an

agreement between Lynn Haven and Company B designating Company B to be the

contractor or vendor for various projects that would be conducted in Lynn Haven

under a ½ Cent Surtax Design/Build Contract, utilizing proceeds from the ½ cent

Bay County sales tax that was in effect for ten years.  This agreement, negotiated

by **ANDERSON** and the owner of Company B, made Company B the contractor

for numerous multi-million dollar Lynn Haven infrastructure projects that would

not require any bid procedure for any of the projects related to the agreement.

46.    On October 24, 2017, the owner of Company B sent a letter to City

Manager M. White advising that he had completed phase one of the project earning

the total amount ($3.8 million) authorized to date.  The letter further stated that

Company B would proceed with the next phase but not invoice Lynn Haven until

the City had obtained the new loan.  The amount of the referenced additional work

was $1.8 million submitted by Company B in an invoice in January 2018.

47.    **MARGO DEAL ANDERSON** directed M. White to allow Company

B to proceed as requested with the work despite no funding being available, a new

loan had not been obtained, the City had not approved the specific roads that

Company B was paving, and engineering work had not been completed on many of

the roads that Company B had finished its work on.

48.    On December 12, 2017, **MARGO DEAL ANDERSON** and the Lynn

Haven Commission approved a resolution authorizing the issuance by Lynn Haven

of a $6,090,000 municipal revenue bond and a loan agreement to be signed with a

financial institution to provide the funding for Lynn Haven to pay for infrastructure

work in the City that was to be conducted by Company B.  The term of the loan

was for 10 years and the interest rate was 2.35 per cent per annum.  **ANDERSON**

signed the resolution and bond loan agreement.

49.     On January 4, 2018, Company B submitted an application to Lynn Haven for payment of $1,850,170.66 for work performed on phase two during approximately a two month period.

50.     In June 2018, the owner of Company B and **MARGO DEAL ANDERSON** requested City Manager M. White to proceed with an additional phase of the 17th Street project.  M. White told **ANDERSON** and the owner of Company B that he wanted to put the project on hold as it was going to cost the City a large amount of money to continue the project and the City did not have the money to pay for the project at that time.  **ANDERSON** and the owner of Company B told M. White that the owner of Company B wanted to proceed with the project.

51.     **ANDERSON** pressured M. White to have Lynn Haven proceed with the project and stated that the owner of Company B would finance the additional approximate $1 million cost of the project.  Despite protestations by City Manager M. White that Lynn Haven did not need the additional debt, **ANDERSON** directed M. White to make it happen.

52.     On August 21, 2018, Lynn Haven advertised for sealed bids from businesses to perform additional work on the 17th Street project.  Since the Florida Department of Transportation (FDOT) had become a partner with Lynn Haven to provide some of the funding for the project, **MARGO DEAL ANDERSON** and

Lynn Haven were required to solicit bids for the additional work on the 17th Street project and obtain the concurrence of FDOT.

53.     Three sealed bids for the additional work on the 17th Street project were submitted: one from Company B, one from a relative of Company B's owner, and one from Company A.  In the past, these three companies had bid on contracts with public entities, agreeing among themselves that one company would submit the lowest bid on a specific project and the other two companies would submit higher bids.  Then, in another public project, a different company would submit the lowest bid.  Company B's $957,000 bid was determined to be the lowest bid and recommended to be awarded to Company B by the Lynn Haven City Engineer.

54.     The sealed bid procedure was intended to make it appear as if the award of the additional work for the project was fair and above board, and would receive the concurrence of the FDOT, which had signed a Joint Participation Agreement with Lynn Haven in the 17th Street project.  Seven months before the selection of Company B for the additional work on the 17th Street project, the owner of Company B arranged to have the Lynn Haven City Engineer sell his 2006 ITAS Motorhome (Motorhome), valued at least at approximately $106,000, to **MARGO DEAL ANDERSON** without the payment of any money by **ANDERSON,** by the following means:

31

    a.    The owner of Company B issued a personal check to the City Engineer in the amount of $75,000, which allowed the City Engineer to pay off, with additional funds that he possessed, a $105,993.70 loan on the Motorhome;

    b.    The motor vehicle title for the Motorhome was transferred to the name of **ANDERSON's** husband after the City engineer initially listed the purchaser as the owner of Company B;

    c.    The transfer of title filed with the Florida Division of Motor Vehicles falsely stated that $35,000 was paid by **ANDERSON's** husband to purchase the Motorhome;

    d.    The Motorhome was titled in the name of **ANDERSON's** husband;

    e.    No money was paid by **ANDERSON** or her husband to obtain this Motorhome valued at approximately $106,000; and

    f.    Approximately 22 months after the transfer of the Motorhome to **ANDERSON** and her husband, **ANDERSON's** husband issued a $20,000 check to the owner of Company B.  This action followed the public reporting of the Federal investigation into public officials in Lynn Haven, including an indictment of two Lynn Haven public officials and three other individuals charged with conspiracy, fraud, and related offenses arising from the defrauding of Lynn Haven. That indictment included allegations that the Lynn Haven Mayor received post-

hurricane repairs to her private property and the work was paid for by Lynn Haven based upon fraudulent invoices that concealed and did not disclose that work performed for Lynn Haven was instead performed at a number of public officials' private residences and the private residences of a few other individuals, yet billed as work performed at Lynn Haven public properties.

55.    On November 6, 2018, **MARGO DEAL ANDERSON** voted for and signed a resolution of Lynn Haven amending the Joint Participation Agreement with FDOT relating to the 17th Street project stating that Lynn Haven had agreed to contract for and complete the work as described in the Joint Participation Agreement with Company B.

56.    On November 7, 2018, less than a month after Hurricane Michael and at the time that the owner of Company B complained to **MARGO DEAL ANDERSON** about not receiving enough hurricane clean-up work, M. White awarded the contract to Company B and executed a contract for Company B to perform an additional amount of work on the 17th Street project in exchange for $957,000.  As directed by **ANDERSON**, this amount was added to the amount of the March 2017 promissory note that Lynn Haven had signed payable to Company B, increasing the amount that Lynn Haven agreed to pay Company B for the project to $5,178,555.  In addition, Lynn Haven was required to pay 2.55 per cent interest annually to Company B on the new note amount.

57.     During the same period of time that **MARGO DEAL ANDERSON**
provided approval for Company B to proceed with the 17th Street project, and for
which Company B received from Lynn Haven regular monthly payments of
approximately $15,000 (including interest) and subsequent work by Company B,
and during the same time period that **ANDERSON** provided approvals for
Company B, signed various documents, and caused Lynn Haven to incur
significant financial obligations for Company B to proceed with numerous projects
in Lynn Haven pursuant to the ½ Cent Surtax Design/Build Contract, **MARGO
DEAL ANDERSON,** in addition to receiving a free Motorhome from the owner of
Company B, also accepted things of value from the owner of Company B,
including travel in a private airplane to Biloxi, Mississippi, and the Florida Keys,
and lodging, meals, and entertainment.

### WorldClaim Insurance

58.     Following Hurricane Michael, Lynn Haven received a request from
WorldClaim public adjusters to work with Lynn Haven to assist in documentation
and adjustment of its claim with insurance companies with respect to losses that
Lynn Haven incurred on October 10, 2018, associated with Hurricane Michael.
Individual A, a Lynn Haven public official, strongly recommended to the City
Manager that Lynn Haven select WorldClaim.

59.     Individual A advised City Manager M. White that a conspirator was to receive a percentage of whatever business the conspirator brought to WorldClaim, and that the conspirator would split with Individual A whatever business was obtained from the City.  Individual A told M. White that if Lynn Haven selected WorldClaim, Individual A would give to M. White some of the money that Individual A was receiving from the conspirator, and M. White, **MARGO DEAL ANDERSON**, and a Lynn Haven Commissioner would not be charged any claims fees by WorldClaim to adjust any private insurance claims for those public officials.

60.     On October 24, 2018, and pursuant to the continuing Declaration of Emergency, **MARGO DEAL ANDERSON** and M. White signed a contract retaining WorldClaim to assist in documentation and adjustment of Lynn Haven's claim under a primary insurance policy with respect to losses that occurred due to Hurricane Michael.  The contract obligated Lynn Haven to pay a sliding fee scale from 3 to 10 per cent of the net recovery between $0 and $60 million.  This contract was entered into without any request for bids or requests for qualifications, incurring a significant financial obligation for the City, in accordance with a local state of emergency resolution that had been extended by Lynn Haven for seven days the day before the signing of the WorldClaim contract and which emergency resolution was scheduled to, and did, expire six days later.

35

61.     Following Hurricane Michael, City Manager M. White sought a claims adjuster for his personal residence and farm for damages sustained to the properties.  White asked Individual A if WorldClaim could help **MARGO DEAL ANDERSON,** M. White, and a City Commissioner.  Individual A advised that WorldClaim would help all three public officials.  WorldClaim handled the insurance claims for hurricane damage to the private residences and properties of **ANDERSON**, M. White, and a City Commissioner.

62.     WorldClaim sent M. White a bill in the amount of $10,000 for its work in adjusting the insurance claims of M. White relating to his private property. The invoice amount of $10,000 was marked through, there were initials next to the mark, and zero dollars was shown as the amount due.  M. White told both **MARGO DEAL ANDERSON** and a City Commissioner that WorldClaim was going to help them with their insurance claims at no cost to them.  WorldClaim agreed to charge both **ANDERSON** and a City Commissioner no fee for its work in adjusting the insurance claims of **ANDERSON** and the City Commissioner relating to their private property.

63.     No money was paid by the City Commissioner for WorldClaim to represent him and assisting him in obtaining approximately $75,000 from an insurance company for damages done to his private property.  Through the efforts of WorldClaim representing her and assisting her with her insurance claim,

36

**MARGO DEAL ANDERSON** obtained approximately $81,125 from an insurance company for damages done to her private property. After the federal investigation of **ANDERSON** and others was made public, **ANDERSON** issued a check to WorldClaim for a reduced fee of only $3,646.

### Florida Requirements To File Public Acceptance of Gifts Reports

64. As Mayor of Lynn Haven, **MARGO DEAL ANDERSON** was a public official who was required under Florida law to file a Form 9, "Quarterly Gift Disclosure" with the Florida Commission on Ethics if she accepted a gift valued at more than $100. This Form 9 was required to be filed during the calendar quarter for which the gift was received, and describe the gift, the name and address of the person making the gift, and the date the gift was received. **ANDERSON** failed to file a Quarterly Gift Disclosure form as required by Florida law from the date of her election as Lynn Haven Mayor in 2015 through June of 2020, despite receiving numerous things of value in excess of $100 from various individuals. **ANDERSON** concealed the receipt of these items.

65. As the City Attorney for Lynn Haven, **JOSEPH ADAM ALBRITTON** was a public official who was required under Florida law to file a Form 9, "Quarterly Gift Disclosure" with the Florida Commission on Ethics if he accepted a gift valued at more than $100. This Form 9 was required to be filed during the calendar quarter for which the gift was received, and describe the gift,

the name and address of the person making the gift, and the date the gift was received. **ALBRITTON** failed to file a Quarterly Gift Disclosure form as required by Florida law from the date of his appointment as City Attorney in October 2018 through June of 2020, despite receiving numerous things of value in excess of $100 from various individuals. **ALBRITTON** concealed the receipt of these items.

66.   **MARGO DEAL ANDERSON** directed Lynn Haven employees to assemble, print, and provide various city records to her that she in turn provided Company B relating to ongoing and planned Lynn Haven projects.

67.   On or about July 13, 2020, the owner of Company B made false statements to a Special Agents of the Federal Bureau of Investigation concerning the transfer of the 2006 ITAS motorhome to **MARGO DEAL ANDERSON** and her husband, and provided to the Special Agents a claimed bill of sale relating to the motor home that falsely stated the motor home was sold by the owner of Company B to Anderson's husband on July 6, 2018, for $70,000 that was paid "half down and half due with 6 percent interest."

68.   The conspirators performed acts and made statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH TWENTY-EIGHT

### A.  INTRODUCTION

The allegations of Count One, Section A, are hereby realleged and incorporated by reference as if fully set forth herein.

### B.  THE CHARGE

Between on or about August 1, 2015, and on or about August 11, 2020, in the Northern District of Florida and elsewhere, the defendants,

**MARGO DEAL ANDERSON**
**and**
**JOSEPH ADAM ALBRITTON,**

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme, did cause wire communications to be transmitted in interstate and foreign commerce.

### C.  SCHEME TO DEFRAUD

It was part of the scheme to defraud that:

The allegations of Count One, Section C, Paragraphs 1-68, are hereby realleged and incorporated by reference as if fully set forth herein.

## D.  WIRE COMMUNICATIONS

On or about the following dates, for the purpose of executing the scheme to

defraud, the defendants,

**MARGO DEAL ANDERSON**
**and**
**JOSEPH ADAM ALBRITTON,**

knowingly did cause wire communications to be transmitted in interstate and

foreign commerce as set forth below:

| COUNT | DATE | WIRE COMMUNICATION |
|:---:|:---:|:---:|
| **TWO** | October 25, 2017 | Email with letter from M. White to engineering firm |
| **THREE** | October 23, 2018 | Text messages between **ALBRITTON** and D. White re work @306 n Palo Alto |
| **FOUR** | October 23, 2018 | Text message **ALBRITTON** to D. White requesting ECS invoice |
| **FIVE** | October 24, 2018 | Text messages between **ALBRITTON** and D. White requesting electrician at girlfriend's residence |
| **SIX** | October 26, 2018 | Deposit of $224,722.75 check and related wire |
| **SEVEN** | October 30, 2018 | Email From **ALBRITTON** To City Manager re use of Company A pit |
| **EIGHT** | October 30, 2018 | Text message from M. White to City Engineer to cancel permit application |
| **NINE** | November 1, 2018 | Email from M. White to Company C directing it to use Company B pit |
| **TEN** | November 8, 2018 | Email including letter of M. White to State of Florida requesting approval for DDMS site for Company B |

| | | |
|---|---|---|
| **ELEVEN** | November 8, 2018 | Text messages between **ALBRITTON** and D. White requesting D. White to come sign task order |
| **TWELVE** | November 9, 2018 | Text messages between **ALBRITTON** and D. White to go to 2114 CC Dr., tarp and patch broken windows) |
| **THIRTEEN** | November 9, 2018 | Text messages between M. White and D. White re **ANDERSON's** property clean-up |
| **FOURTEEN** | November 15, 2018 | Text messages between **ALBRITTON** and D. White re needing invoice |
| **FIFTEEN** | November 15, 2018 | Deposit of $1,288,716.54 check and related wire |
| **SIXTEEN** | November 19, 2018 | Email From **ALBRITTON** To Company A Executive re justification for Company A pit |
| **SEVENTEEN** | November 28, 2018 | Text message From D. White to **ALBRITTON** ("$$$") |
| **EIGHTEEN** | November 30, 2018 | Deposit of $433,365.85 check and related wire |
| **NINETEEN** | December 14, 2018 | Deposit of $515,731.31 check and related wire |
| **TWENTY** | December 26, 2018 | Text messages of M. White and D. White re **ANDERSON** has a "good job" for D. White |
| **TWENTY-ONE** | December 31, 2018 | Deposit of $725,941.09 check and related wire |
| **TWENTY-TWO** | January 7, 2019 | Text messages of **ALBRITTON** and M. White |
| **TWENTY-THREE** | January 14, 2019 | Text messages between **ALBRITTON** and D. White requesting D. White to sign addendum to Lynn Haven contract |
| **TWENTY-FOUR** | January 15, 2019 | Deposit of $895,441.52 check and related wire |
| **TWENTY-FIVE** | January 16, 2019 | Text messages between **ALBRITTON** and D. White re trailer invoice |
| **TWENTY-SIX** | January 31, 2019 | Deposit of $433,259.16 check and related wire |

| TWENTY-SEVEN | February 18, 2019 | Text message from **ALBRITTON** to D. White re need for invoice for enclosed trailer |
| TWENTY-EIGHT | March 9, 2019 | Text message from **ALBRITTON** to D. White re need for invoice for both storage units |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWENTY-NINE

Between on or about October 10, 2018, and on or about April 30, 2019, in the Northern District of Florida, and elsewhere, the defendants,

## MARGO DEAL ANDERSON
## and
## JOSEPH ADAM ALBRITTON,

being agents of an organization and agency of the local government, that is, the City of Lynn Haven, Florida, receiving in the one-year period beginning October 10, 2018, benefits in excess of $10,000 under a federal program involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance, did knowingly embezzle, steal, obtain by fraud, without authority convert to the use of a person other than the rightful owner, and intentionally misapply property that was valued at $5,000 or more and under the care, custody, and control of such organization, local government, and agency.

In violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

42

## COUNTS THIRTY THROUGH SIXTY-TWO

### I.  Introduction

The allegations of Count One, Section A, are hereby realleged and incorporated by reference as if fully set forth herein.

### II.  The Charge

Between on or about August 1, 2015, and on or about August 11, 2020, in the Northern District of Florida and elsewhere, the defendants,

**MARGO DEAL ANDERSON**
**and**
**JOSERPH ADAM ALBRITTON,**

did knowingly and willfully devise and intend to devise a scheme to defraud and deprive the City of Lynn Haven and its citizens of their right to the honest services of **ANDERSON**, the elected Mayor of Lynn Haven, Florida, and **ALBRITTON,** the City Attorney for Lynn Haven, Florida, through bribery or kickbacks.

### III.  The Fraudulent Scheme

The fraudulent scheme is summarized in paragraphs 1 through 68 of Section C of Count One, which are realleged and incorporated by reference as if fully set forth herein.

### IV.  Wire Communications

On or about the following dates, in the Northern District of Florida and elsewhere, the defendants,

43

**MARGO DEAL ANDERSON**
**and**
**JOSEPH ADAM ALBRITTON,**

for the purpose of executing the fraudulent scheme, caused wire communications

to be transmitted in interstate commerce as set forth below.

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| **THIRTY** | October 6, 2017 | Deposit of $2,272,669.87 check and related wire |
| **THIRTY-ONE** | October 13, 2017 | Deposit of $72,000 check and related wire |
| **THIRTY-TWO** | October 25, 2017 | Email of letter from M. White to engineering firm |
| **THIRTY-THREE** | November 6, 2017 | Deposit of $1,455,330.13 check and related wire |
| **THIRTY-FOUR** | January 8, 2018 | Deposit of $1,850,170.66 check and related wire |
| **THIRTY-FIVE** | February 16, 2018 | Deposit of $75,000 check from owner of Company B into the account of Individual A for Motorhome and related wire |
| **THIRTY-SIX** | October 23, 2018 | Text message **ALBRITTON** to D. White requesting ECS invoice |
| **THIRTY-SEVEN** | October 24, 2018 | Text messages between **ALBRITTON** and D. White requesting electrician at girlfriend's residence |
| **THIRTY-EIGHT** | October 26, 2018 | Deposit of $224,722.75 check and related wire |
| **THIRTY-NINE** | October 30, 2018 | Email From **ALBRITTON** To City Manager re use of Company A pit |
| **FORTY** | October 30, 2018 | Text message from M. White to City Engineer to cancel permit application |

| | | |
|---|---|---|
| **FORTY-ONE** | November 1, 2018 | Email from M. White to Company C directing it to use Company B pit |
| **FORTY-TWO** | November 8, 2018 | Email including letter of M. White to State of Florida requesting approval for DDMS site for Company B |
| **FORTY-THREE** | November 8, 2018 | Text messages between **ALBRITTON** and D. White requesting D. White to come sign task order) |
| **FORTY-FOUR** | November 9, 2018 | Text messages between M. WHITE and D. WHITE re **ANDERSON** property clean-up |
| **FORTY-FIVE** | November 9, 2018 | Text messages between **ALBRITTON** and D. White to go to 2114 CC Dr., tarp & patch broken windows |
| **FORTY-SIX** | November 15, 2018 | Text messages between **ALBRITTON** and D. White re needing invoice |
| **FORTY-SEVEN** | November 15, 2018 | Deposit of $1,288,716.54 check and related wire |
| **FORTY-EIGHT** | November 28, 2018 | Text message From D. White to **ALBRITTON** ("$$$") |
| **FORTY-NINE** | November 30, 2018 | Deposit of $433,365.85 check and related wire |
| **FIFTY** | December 14, 2018 | Deposit of $515,731.31 check and related wire |
| **FIFTY-ONE** | December 26, 2018 | Text messages of M. WHITE and D. WHITE re **ANDERSON** has a "good job" for D. White |
| **FIFTY-TWO** | December 31, 2018 | Deposit of $725,941.09 check and related wire |
| **FIFTY-THREE** | January 7, 2019 | Text message of M. White and **ALBRITTON** |

| **FIFTY-FOUR** | January 14, 2019 | Text messages between **ALBRITTON** and D. White requesting D. White to sign addendum to Lynn Haven contract |
|---|---|---|
| **FIFTY-FIVE** | January 15, 2019 | Deposit of $895,441.52 check and related wire |
| **FIFTY-SIX** | January 16, 2019 | Text messages between **ALBRITTON** and D. White re trailer invoice |
| **FIFTY-SEVEN** | January 31, 2019 | Deposit of $433,259.16 check and related wire |
| **FIFTY-EIGHT** | February 8, 2019 | Email from WorldClaim to **ANDERSON** including attachment of contract and no fee addendum for WorldClaim to be private insurance adjuster |
| **FIFTY-NINE** | February 12, 2019 | Email from **ANDERSON** to WorldClaim including signed contract for WorldClaim to be private insurance adjuster |
| **SIXTY** | February 18, 2019 | Text message from **ALBRITTON** to D. White re need for invoice for enclosed trailer |
| **SIXTY-ONE** | March 9, 2019 | Text message from **ALBRITTON** to D. White re need for invoice for both storage units |
| **SIXTY-TWO** | January 16, 2020 | Deposit of $20,000 check on **ANDERSON** account payable to Company B owner and related wire |

In violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT SIXTY-THREE

On or about November 18, 2019, in the Northern District of Florida and

elsewhere, the defendant,

46

## MARGO DEAL ANDERSON,

did knowingly and willfully make materially false, fictitious, and fraudulent

statements and representations in a matter within the executive branch of the

Government of the United States, that is, the defendant falsely stated that:

     a.    **ANDERSON** was unaware of the role of Erosion Control

Specialists (ECS) in the post-Hurricane Michael clean-up of Lynn Haven;

and

     b.    **ANDERSON** was first introduced to David "Mickey" White in

December 2018 or January 2019, when volunteers were used to clean up

various streets designated by Lynn Haven as needing some attention and

clean-up.

These statements and representations were false because, as **ANDERSON**

then well knew:

     a.    **ANDERSON** was aware that ECS had been contracted by

Lynn Haven to conduct debris removal and repairs in the City of Lynn

Haven after Hurricane;

     b.    **ANDERSON** was introduced to David "Mickey" White

through City Manager Michael White shortly after Hurricane Michael and

requested David "Mickey" White to have ECS clean up her private residence.

In violation of Title 18, United States Code Section 1001(a)(2).

## COUNT SIXTY-FOUR

### A.  CHARGE

Between on or about October 10, 2018, and April 1, 2019, in the Northern District of Florida and elsewhere, the defendant,

### JOSEPH ADAM ALBRITTON,

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme, did cause a matter to be delivered by the United States Postal Service and commercial interstate carrier.

### B.  SCHEME TO DEFRAUD

It was part of the scheme to defraud that:

1.      The defendant, **JOSEPH ADAM ALBRITTON,** made, and caused to be made, false and fraudulent representations to the St. John's Insurance Company concerning damages to his residence in Lynn Haven, Florida, as a result of Hurricane Michael in order to fraudulently obtain money from the St. John's Insurance Company.

2.     **JOSEPH ADAM ALBRITTON** represented in a claim that his residence had been damaged by Hurricane Michael and falsely represented that he had paid for tree removal, debris removal, and installation of a tarp to his residence totaling $9,600.

3.     In fact, the tree removal, debris removal, and installation of a tarp to the residence and property of **JOSEPH ADAM ALBRITTON** had been made by Erosion Control Specialist (ECS) at no cost to him, as ECS received payment from the City of Lynn Haven for its employees making the repairs and conducting debris removal at **ALBRITTON's** residence.  However, the City of Lynn Haven was not aware that ECS had made repairs to **ALBRITTON's** personal residence, as the City of Lynn Haven was falsely billed for alleged work on city properties.

4.     To facilitate the scheme, **JOSEPH ADAM ALBRITTON** solicited ECS to create a false and fictitious invoice attesting to repair work done to his residence after the hurricane by ECS in the amount of $9,600, and that the amount of the invoice was paid in full on October 24, 2018, which invoice **ALBRITTON** then submitted to St. John's Insurance Company in support of his fraudulent insurance claim.

5.     Based upon the false claim, St. John's Insurance Company issued payment in the amount of $6,100 to **JOSEPH ADAM ALBRITTON** that was based upon the false ECS invoice for the tree removal, debris removal, and installation of a tarp to **ALBRITTON's** residence and represented payment of the $9,600 less a deductible under the insurance property.  This payment was mailed to **ALBRITTON's** address in Lynn Haven.  **ALBRITTON** caused the St. John's Insurance Company insurance check to be deposited into a bank account belonging to him.

### C.  MAILING

On or about November 29, 2018, the defendant,

### JOSEPH ADAM ALBRITTON,

knowingly did, for the purpose of executing the fraudulent scheme and attempting to do so, cause to be transmitted by United States mail and private and commercial carrier, a $6,100 check issued from the St. Johns Insurance Company.

In violation of Title 18, United States Code, Sections 1341 and 2.

### CRIMINAL FORFEITURE

The allegations contained in Counts One through Sixty-Two, and Sixty-Four of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture.  From their engagement in the violations alleged in Counts One through Sixty-Two, and Sixty-Four of this Indictment, the defendants,

**MARGO DEAL ANDERSON**
**and**
**JOSEPH ADAM ALBRITTON,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of the

defendants' right, title, and interest in any property, real and personal, constituting,

and derived from, proceeds traceable to such offenses, including the following:

    a.    2006 ITAS Motorhome, VIN#4UZACKDC26CW30357.

If any of the property described above as being subject to forfeiture, as a

result of acts or omissions of the defendants:

        i.    cannot be located upon the exercise of due diligence;

        ii.    has been transferred, sold to, or deposited with a third party;

        iii.    has been placed beyond the jurisdiction of this Court;

        iv.    has been substantially diminished in value; or

        v.    has been commingled with other property that cannot be

            subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c),

51

to seek forfeiture of any other property of said defendant up to the value of the

forfeitable property.

A TRUE BILL:

FOREPERSON

08/18/2020
DATE

LAWRENCE KEEFE
United States Attorney

STEPHEN M. KUNZ
Assistant United States Attorney

52